HENRY F. MEREDITH, Respondent, v. ADA MEREDITH, Appellant.

St. Louis Court of Appeals, April 18, 1899.

1. **Suit to Annul Marriage Contract:** EQUITABLE ACTION. In the case at bar the action is to set aside and declare void a contract which plaintiff says he was forced to make by duress *per minas* and is addressed to and cognizable upon the equity side of the court.

2. ———: DURESS. In the case at bar, taking into view the age of plaintiff, twenty-eight years, his sex, the situation in which he was placed, and the moral obligation he was under to marry the defendant, and to legitimize his unborn child and the fact that he was defiant of Brown and his pistols and did not consent to marry the defendant until different parties made a just and humane appeal to him to do the part of an honorable man by marrying the woman, whom he admitted he had ruined. Held, that his will was not so far overcome by the threats of Brown, that through fear of loss of his life, or of great bodily harm, he consented to marry the defendant.

Meredith v. Meredith.

3. ——: ——: THREATS: PRESUMPTION. Threats and acts of intimidation do not necessarily prove duress, and where the party was under a moral obligation to enter into or discharge a contract, the presumption is that he acted from a sense of moral duty, and this presumption should be weighed in the scale against the evidence of duress.

*Appeal from the Hannibal Common Pleas Court.*

REVERSED.

R. E. ANDERSON for respondent.

Her coolness while the *vinculo matrimonii*, that should be the offspring of love are being forged by gunpowder and bullet; her tacit consent to the departure of her victim immediately following the mock ceremony all go to show that she was the author of her own misfortune, and in no condition to murmur at the policy of the law, which in its majesty, declares such a proceeding void *ab initio*. Her motto should have been *virtuti, non armis, fido*. Marriage is considered in law as a civil contract, to which the consent of the parties capable in law of contracting is essential. R. S., sec. 6840. A marriage procured by force or fraud is void, *ab initio* and may be treated as null by every court in which its validity may be incidentally drawn in question. The basis of the marriage contract is consent, and the ingredient of fraud or duress is as fatal in this as in any other contract, for the free assent of the mind is wanting. Kent's Com., pp. 40, 41. *Consensus, non concubitas, facit nuptias.* 1 Blackstone's Com., sec. 434. When a consent, in form, is brought by force, menace or duress, a yielding of the lips but not of the mind, it is of no legal effect. This rule which is applicable to all contracts finds no exception in marriage. There may be the form of a matrimonial consent, when there is no consent, when there is no consent in reality. It is so where the solemnization is obtained by fraud, conspiracy or duress, or where it is the result of error. Bishop on Marriage and

Divorce [Ed. 1856], secs. 63, 99, 119, 120. In the case of Davis v. Luster, 64 Mo. 43, referred to in appellant's brief, it is held that where contracts are made in consequence of fraudulent advantage taken of the affections or sensibilities of a party, or under the influence of threats or apprehensions, although not amounting to legal duress, equity will grant relief. Judge Story says that circumstances of extreme necessity and distress of a party, though not accompanied by any direct restraint or duress, may so entirely overcome his free agency as to justify the court in setting aside a contract made by him on account of some oppression or fraudulent advantage or imposition attendant upon it. In such case he has no free will, but stands *in vinculis*. 2 Story Eq., sec. 239.

· THOMAS H. BACON for appellant.

Although estoppel was not pleaded, this was a case in equity and a plea at law would have been out of place. Selah v. Selah, 8 C. E. Greene N. T. 185. The case made by plaintiff shows on its face, as upon demurrer to evidence in a case at law that the plaintiff was estopped from claiming or pleading that he did not consent to marriage. The doctrine of "clean hands" should be applied to this case. "He who seeks equity, must do equity." The plaintiff wickedly and falsely, himself brought about the occasion of the alleged wrong of which he complains. The plaintiff comes into court with his hands reeking with corruption and asks the court to give him equitable relief. Cassidy v. Metcalf, 1 Mo. App. 593, 601; Wilson v. St Louis, 120 Mo. 45, 58; Southworth v. Hopkins, 11 Mo. 331. The father found the honor of his family in abasement. There was no court for him, neither should there be in this suit any for the betrayer. Is equitable relief stored up to rescue malefactors from the results of their misdeeds? There is a recent decision of the supreme court on a Macon court case where a father slew his daughter's

ravisher, and the opinion by Judge Sherwood made advanced allowances having an argumentative bearing on this case. The evidence in this case indicates that it was but the night before that the father was made aware of the circumstances. Besides the personal and family ignominy, the plaintiff in the case at bar had put on the defendent the support of his confessed offspring. Can equity aid him in escape from this responsibility. The case of Davis v. Luster, 64 Mo. 43, bears strongly against relief from alleged duress under such circumstances. The maxim *"ex turpi causa actio non oritur,"* is also applicable. So also *"ex dolo malo non oritur actio."* Hatch v. Hanson, 46 Mo. App. 323, 330; Turley v. Edward, 18 Mo. App. 676, 682. So the maxim *"in pari delicto."* Davis v. Luster, 64 Mo. 43, 46. The evidence shows that plaintiff was induced to marry through appeals made to him by others than the plaintiff's father, and that he did so marry without being prevailed on by threats or coercion, and that plaintiff admitted this the day after the marriage.

BLAND, P. J.—Plaintiff in his petition alleges in substance that on September 12, 1897, a marriage was solemnized between himself and defendant in the county of Marion, Missouri; that he was forced to consent to said marriage through fear of loss of his life, limbs or other remediless harm to his person at the hands of A. G. Brown, the father of the defendant, who was present at the performance of the marriage ceremony with a loaded revolving pistol in each hand and threatening to give plaintiff their contents, if he did not then and there marry his daughter; that immediately after the ceremony of marriage was performed he repudiated the marriage and left the defendant and the house of Brown, where the marriage took place, and has not at any time since lived with nor recognized the defendant as his wife. His prayer is that the contract of marriage be declared null and void. The answer admitted the marriage, but denied every other allegation of the petition. The bill of exceptions recites that a jury was waived

and the issues were submitted to the court. Instructions were asked and given on the part of defendant; none were asked or given for plaintiff. After hearing the evidence the court found the issues for the plaintiff and entered a decree annulling the marriage. The action arises, not on account of a breach of a contract to which defendant pleads duress in its procurement, which would be triable on the law side of the court; but it is to set aside and declare void a contract which plaintiff says he was forced to make by duress *per minas* and is addressed to and cognizable only upon equity side of the court, and we shall treat the cause as one of equitable jurisdiction and as having been heard by the circuit judge sitting as a chancellor.

The cause being an equitable one, this court will try it *de novo* on both the law and the evidence; and while an appellate court in this character of a case will somewhat defer to the findings of the trial court as to the facts, and will ordinarily, when the facts are in doubt, solve that doubt by adopting the findings of the trial judge; yet it is not bound to do so, and may, and often will, reach a conclusion by its own analysis of the evidence. Roselle v. Beckemeir, 134 Mo. 380; Clarkson v. Hatton, 143 Mo. 48; Lins v. Lenhardt, 127 Mo. 271. A summary of the facts as we gather them from the evidence preserved in the bill of exceptions are as follows:

PRACTICE, appellate.

In the fall of 1896, the defendant was employed as a teacher in one of the public schools of the city of Hannibal, and boarded at the home of Mrs. Pine, an aunt of the plaintiff, where he visited and where he first became acquainted with the defendant. Plaintiff visited defendant frequently at the home of his aunt, would often call for her with his horse and buggy and convey her from the school to her boarding place, and paid her such attentions as are usually paid by a young man courting a girl. In the progress of this courtship and in April, 1897, after repeated repulses, the plaintiff succeeded

Meredith v. Meredith.

in having sexual intercourse with the defendant, promising, as defendant testified, that should she become pregnant, he would not abandon her, but would marry her.

STATEMENT of facts. The act of sexual intercourse was repeated several times after this and defendant became pregnant with child. After the close of her school in the summer of 1897, the plaintiff advised the defendant to go away from Hannibal and furnished her $30 in money to pay her traveling expenses, and she went to Texas to visit a lady friend who had partly raised her. Before going, .however, she consulted a physician, from whom she learned that she was pregnant, and so informed the plaintiff. Plaintiff advised her to consult another physician, as the first one, as he said, might be mistaken, and promised to meet defendant and accompany her to the second physician; this promise however he did not keep. After arriving in Texas defendant wrote plaintiff a letter, which plaintiff did not produce, claiming to have lost or misplaced it, but to which he wrote and mailed to the defendant the following answer:

"Thursday, Aug. 20th.

"Dear Ada:—Rec'd your letter last Monday. I would have ans. sooner but was busy with an apple man. I sold my orchard and I guess that I beat myself out of 25 or 50 dollars. Your father sent word for me to come and see him, so I went down to the warehouse. He talked very nice to me, but he thought it was a great mistake that you went away, as you did, and I think he is about right. For it means that $30 has been practically wasted. Now, Ada, you want to stay where you are for a week or so, at any rate, until I can make different arrangements. And above all hold on to what money you have, don't waste it, for it is too hard to get. I can't come down and marry you, as you suggested, for many reasons; and the principal one is that it would be the height of folly to take such a step with no money, no job, and no prospect of either. We could not live on air. Furthermore,

mother is bitterly opposed to such a thing. She said the other night that it is a choice between her and you. It would kill her, I expect, for she would grieve herself to death. I want to do the best I can by you, Ada, and will try to do so. But I don't think that marriage would benefit us much, even if it were the best thing. Your father wants you to come back home, it would be best for you could have some care there. I don't know whether he is going away or not. If he does go and you could go with him, it would be best, especially if you would consent to try. (Tutt). (Would you be willing to try that?) Now, Ada, keep up a good heart for I am not going to leave you in the lurch, and I believe your father would do anything for you now. Write and answer my question soon and keep quiet where you are for a while. Will write you again in a day or two. Good-bye little girl. Yours,

"H. E. Meredith.

"P. S.—I told your father everything because I thought it best."

Shortly after the reception of the letter the defendant returned home, when the plaintiff at her request called to see her on several occasions to consult about what was best to do in her condition. On Saturday previous to Sunday, September 12, the day of the marriage, Brown called at the recorder's office in Hannibal and procured a license for the marriage of plaintiff and his daughter. He also engaged the service of Judge Harrison, a justice of the peace, to solemnize the marriage, and procured the attendance of two persons to witness the ceremony. Plaintiff, in ignorance of these arrangements of the marriage, in response to a written request sent him by defendant, called at the residence of Brown about 7:30 p. m.; he was met at the door by the defendant and conducted into the parlor. In a few minutes Mrs. Brown, the stepmother of defendant, came in and took her seat; shortly Brown came in armed with two revolvers, spoke to plaintiff and said to him, that he had procured a license and had secured

a justice of the peace and expected him to marry his daughter that night. Plaintiff replied that he was not ready to marry his daughter. Brown then called in Judge Harrison. At this point there was some conflict in the evidence as to what took place. Plaintiff says that when Harrison came in Brown repeated that he "expected him to marry the girl that night," and that he (plaintiff) repeated his former statement that "he was not ready to marry the girl," and accused Brown of driving his daughter from home. Brown replied that it was a lie, that he did not drive his daughter from home; plaintiff then said he lied, for his daughter had told him so; then Brown pulled a pistol from his pocket and said "I will teach you to attend to my affairs." Harrison then said let me talk to the young man, and that he did talk to him and tried to persuade him to marry the girl that night; that he then said to Brown, "suppose I refuse to marry your girl," and Brown replied "you take the contents of these guns," and pulled out the second revolver. Then Reed, one of the witnesses, said let me talk to the young man, and that Reed and the other witness called in to witness the marriage, came in and talked to him, but that he made no reply to them. Brown then said, "The young man will marry the girl to-night. He can have all the time he wants to think it over, but he will marry the girl to-night;" that when this conversation was going on witness was in a bay window and Brown was at the door leading into the hall, the only door furnishing exit from the parlor; that after some further conversation to persuade him to marry the girl, he said to Brown, "you have worked a nice scheme to get me here, have got the drop on me to-night and I will marry the girl," and that he stood up and was married to the girl by Judge Harrison. On cross-examination plaintiff testified that he thought Brown was wrought up and excited, and that he was angry and would use his gun, and that he intended to use it; that he did not think Reed and Stark (witnesses to the marriage) intended to interfere very much, and that he thought

the only way he could avoid standing as a mark for Brown's revolver was to marry the girl. If the evidence of plaintiff of what took place at the time of the marriage were uncontradicted, and if he had not been contradicted by his own witness, Judge Harrison, as to what took place; or, if full credit could be given his testimony, there would be no difficulty in finding that he was moved by the influence of impending danger to his life, or of irreparable bodily injury, to marry the defendant, and we could unhesitatingly affirm the judgment, but Judge Harrison, who solemnized the marriage, and who was called by the plaintiff as a witness in his behalf, says that Brown said to plaintiff, that he was there with the justice to have him marry his daughter, that Brown had a pistol, possibly two; that Brown stood there and reasoned the matter with plaintiff for quite a length of time, telling him that he thought it became his duty to marry his daughter, talking in a very persuasive, gentlemanly manner, that the plaintiff was not at all alarmed; that he was as defiant as a man could be; he laughed; he said "this won't work; this scheme that you have put up on me; this job you have put up on me to get me here won't work; you can't bulldoze me into this marriage." Brown replied "it must be done or trouble will follow;" that he (Harrison) went to plaintiff, who was very much unconcerned about the matter, and said to him, "Mr. Meredith if you are the author of that girl's ruin it becomes your duty as an honorable man to right this wrong, to legitimize the name of this unborn child; that he told him that he was not there to perform a ceremony under duress; that he was not there to marry him if he persisted that he was not the author of the girl's ruin, but that that matter rested entirely within his breast; that he said to him, "if you are the author of her ruin, and you say you are, get up here and marry this woman like a man;" that Reed and Stark also talked to him and that the matter was discussed pro and con for quite awhile, and that plaintiff said to him that he was the author of the girl's ruin, and consented to marry the

girl, and they got up and stood side by side, and he pronounced the marriage ceremony.   Harrison also stated that while the discussion was going on Brown was in the room with his revolvers in his hands, but took no part in the discussion, made no demonstrations, said nothing and probably did not hear the discussion; that on the next day the plaintiff called at his office and expressed a desire to have the publicity of the marriage suppressed, and said so far as he was concerned, he would willingly live with defendant as his wife, but that if he should his mother would disinherit him, and that he could not and would not live with her."

The evidence of defendant as to threats and acts of intimidation by her father on the occasion, is that he was not excited; that his conduct toward plaintiff was not threatening, but that he told him that he should marry that night; that plaintiff admitted to her and to her father that he was the author of her ruin, and she testified most positively that no other man ever had sexual intercourse with her.   Abundant testimony was adduced as to the previous chaste character of the defendant.   Plaintiff admitted that he had attempted on several occasions to have intercourse with defendant, but said he had never succeeded, and stated that he did not believe that he was the father of her unborn child.   He contradicted several very material statements testified to by his own witness, Judge Harrison; he readily responded to questions of counsel intended to elicit answers favorable to his case and his memory was fresh and unhesitating on all facts favorable to him, but was exceedingly cloudy and often failed to recall facts which were against him, such facts too as he should have remembered and which he would have testified to had he not believed it to his interest to suppress them.   Neither Brown, Reed, Stark nor Mrs. Brown, all present at the marriage, testified on the trial.   All of these should have been called if within the reach of the process of the court.   The case as presented by the evidence heard at the trial is not without difficulty of a

satisfactory solution. Duress *per minas*, according to the Roman and the common law, is restricted to fear of loss of life or of remediless injuries to the person or of imprisonment, the fear being founded upon sufficient reason. Blackstone's Com., side pages 130, 131. But the modern doctrine is that "duress is established where actual or threatened violence or restraint contrary to law compels one to enter into or discharge a contract." Cribbs v. Sowle, 87 Mich. 340; Wilkerson v. Hood, 65 Mo. App. 491; Evans Pothier on Obligations, 1-18; 1 Parsons on Contracts, 395; Bouvier's Law Dict.; Anderson's Law Dict. Judge Story says that, " the constant rule in equity is that where a party is not a free agent and is not equal to protecting himself the court will protect him." Story's Eq., sec. 239. But as equity follows the law we apprehend that the degree of force to constitute duress in equity is not different or less than at law. Pomeroy's Eq., sec. 950. Mr. Bishop says: "The same legal principles governing the application of the doctrine of duress to contracts generally are applicable to marriage contracts." 1 Bishop on Marriage and Divorce, sec. 210. The same author in the succeeding section (211) speaking of the degree of force necessary to establish duress says: "Probably the better view is that this is a question of evidence." This is said in criticism of the harsh common law rule' which required the danger or threatened danger to be such as would overcome a strong man, and is certainly the more reasonable and just view. In every case of this character regard should be had to the age, the sex and situation of the party. Force that would overcome and intimidate a mentally feeble person, or one void of courage, would not daunt a strong person or one of heroic courage. Applying these doctrines of law and equity to the issue in the case—duress *per minas*, and taking into view the age of plaintiff (twenty-eight years), his sex, the situation in which he was placed, and the moral obligation he was under to marry the defendant, and to legitimize his unborn child, we are not persuaded that his will

Meredith v. Meredith.

was so far overcome by the threats of Brown, that through fear of loss of his life or of great bodily harm, he consented to marry the defendant. According to the testimony of Judge Harrison, he was defiant of Brown and his pistols, and he did not consent to marry the defendant, until Harrison and others made a just and humane appeal to him to do the part of an honorable man, by marrying the woman, whom he admitted he had ruined. When this appeal was made to him his better instincts for the moment got the mastery of his pride and fear of being disinherited by his mother, and he stood up, as he should have done, and was married to the defendant. Harrison testified, and he is not contradicted in his statement, that he told plaintiff he was not there to marry him by force. On the next day after the marriage plaintiff said to Harrison, that as for himself he had no objections to living with the defendant as his wife, but if he did so his mother would disinherit him. Threats and acts of intimidation do not necessarily prove duress, and where the party was under a moral obligation to enter into or discharge a contract, the presumption is that he acted from a sense of moral duty, and this presumption should be weighed in the scale against the evidence of duress, as for instance, where one person pays money which he was under a moral but not legal obligation to pay, and another pays money which he was under neither a legal nor moral obligation to pay, and both claim payment under duress *per minas*, it should not require as cogent proof to establish the duress in the latter as in the former case. The reported cases furnish many illustrations of the application of this doctrine of evidence. Thus in Honnett v. Honnett, 33 Ark. 156, where a man had seduced a woman was threatened by her brother-in-law and informed that the community would lynch him if he did not marry the woman, but no bodily restraint or harm was placed upon him, and thereafter he did marry her, it was decided that he could not claim the marriage to be illegal on the ground of duress, while in the case of Cribbs v.

Sawle, *supra*, it was decided that Cribbs could recover money back which he did not owe and was under no moral obligation to pay; that he paid to avoid a threatened criminal prosecution for selling cider, which he in fact had not sold. · The fact that Brown had his revolvers and made a demand on plaintiff to marry his daughter, or "trouble would follow," does not establish duress, under the circumstances of the case. The conversation of the plaintiff and his defiant attitude, which are the best index to his mental state, will not permit the inference of duress to be drawn. Blair v. Coffman, 5 Am. Dec. 659. He did what he was morally obliged to do, married the woman he had seduced, and fulfilled a promise he had made to her. Every noble sentiment of the human heart protests against annulling a marriage contracted in such circumstances, and it should not be done except upon the clearest and most satisfactory proof. Equity will not bastardize an innocent child and brand its mother with an unholy name, as we are asked to do in· this case, except upon the most convincing proof. Such proof is not found in the record before us, and we reverse the judgment. All concur.