Marre v. Marre.

## LOUIS MARRE, Respondent, v. AGNES E. NASH MARRE, Appellant.

**St. Louis Court of Appeals.    Submitted on Briefs May 6, 1914. Opinion Filed June 20, 1914.**

1. **MARRIAGE: Annulment: Defenses: Burden of Proof.** In an action to annul a marriage, the burden rested upon defendant to prove her affirmative defense, that she and plaintiff were legally married prior to the marriage sought to be annulled.

2. ————: ————: ————: **Sufficiency of Evidence.** In an action to annul a marriage, evidence *held* insufficient to establish a defense that the parties were legally married prior to the marriage sought to be annulled.

3. ————: ————: **Duress: Sufficiency of Evidence.** In an action by a husband to annul a marriage on the ground that it had been brought about through duress, evidence *held* insufficient to show duress.

4. ————: **Contracts.** The marriage relation, in law, rests on a contract.

5. ————: **Annulment: Duress.** Mere apprehension of physical injury or the possibility of sustaining such injury does not constitute duress justifying the annulment of a marriage, but, in order to constitute such duress, there must be fear of that degree of violence, threatened and impending or actually inflicted, as would be sufficient to overcome the mind and will of a person of ordinary firmness, and it is also essential that the duress be exercised and enforced at the time the marriage contract is entered into.

6. ————: ————: **Negro Blood: Sufficiency of Evidence.** In an action by a caucasian to annul a marriage on the ground that defendant was a negress, evidence *held* insufficient to establish the charge.

7. ————: ————: **Burden of Proof.** In an action by a white person to annul a marriage on the ground that defendant was a negress, the burden of proof was on plaintiff.

8. ————: ————: **Appellate Practice: Scope of Review.** The appellate court will weigh the evidence, on appeal from a judgment annulling a marriage.

9. ————: **Mixed Marriages: Negro Blood: Statute.** Section 8280, R. S. 1909, declaring marriages between white persons

and negroes void, has reference to blood or race, and not to color.

10. ——: ——: ——: ——. In view of the fact that Sec. 8?80, R. S. 1909, declaring marriages between white persons and negroes void, is in *pari materia* with Sec. 4727, which denounces marriages between white persons and persons having one-eighth part, or more, of negro blood and prescribes a punishment for such marriages, a "negro," within Sec. 8280, is a person having one-eighth part, or more, of negro blood.

11. **STATUTES: Construction.** Statutes that are in *pari materia* must be construed together.

12. **MARRIAGE: Annulment: Clean Hands.** An action to annul a marriage is one in equity and hence is subject to the rule that, in order for plaintiff to prevail, he must appear with clean hands.

13. ——: ——: ——. In an action to annul a marriage, *held* that plaintiff did not appear with clean hands and hence he was not entitled to recover.

Appeal from St. Louis City Circuit Court.—*Hon. Charles Claflin Allen,* Judge.

REVERSED.

*George B. Webster* for appellant.

(1) On his own testimony the plaintiff was not entitled to a decree. (a) He testified that he knew before the marriage that the defendant was a negress, and hence he knowingly committed a criminal offense. The purpose of his bill is to obtain relief from his own illegal act. Equity will not relieve a wrongdoer from the consequence of his own wrong, but will leave such an one just where it finds him. 16 Cyc., p. 145; 2 Pomeroy, Eq. Jur. (3 Ed.), sec. 940; Sample v. Barnes, 14 How, 74; Tyler v. Larimore, 19 Mo. App. 445; Ward v. Hartley, 178 Mo. 140; Ryan v. Miller, 236, Mo. 496. (b) Giving to the plaintiff evidence absolute verity, it was still insufficient, since there was no evidence whatsoever from which it might be de-

termined what degree, if any, of African blood the defendant had. State v. Melton, 44 N. C. 49; Linton v. State, 88 Ala. 219; McPherson v. Com., 28 Gratt, 929; Gentry v. McMinnis, 3 Dana, 382, 385; People v. Hall, 4 Cal. 399; R. S. Mo., 1909, sec. 4727. (c) The evidence was insufficient to establish the allegation that the defendant is of negro blood. (d) There was no proof of that duress which is legally sufficient to avoid a contract, or of such intimidation, restraint or detention as precludes free and voluntary action. 2 Greenleaf, Ev., sec. 301; Wilkerson v. Hood, 65 Mo. App. 491; Meredith v. Meredith, 79 Mo. App. 636; Rolson v. DeHart, 134 Mo. App. 633; Dausch v. Crain, 199 Mo. 323; Wood v. K. C. Home T. Co., 223 Mo. 537; Fellows v. School Dist., 39 Me. 559; Edwards v. Bowden, 107 N. C. 58; Schoelhamer v. Rometsch, 26 Ore. 394; Williams v. Stewart, 115 Ga. 864; Young v. Simon, 41 Ill. App. 28; Lamson v. Boydon, 57 Ill. App. 232; Morse v. Woodward, 155 Mass. 233; Thorne v. Thorne, 57 Wash. 441. A man who permits himself to be frightened by empty words cannot set up his cowardice as a sufficient excuse to relieve him from the performance of his contract. Bosley v. Shannon, 26 Ark. 280; Wells v. Sluder, 70 N. C. 55. The uncontroverted testimony of the defendant that at the time of the alleged forced marriage she was with child by the plaintiff raised the presumption that the marriage resulted from an impulse on his part to do the honorable thing by the defendant, and this made heavier the burden of proof which he was required to sustain. Meredith v. Meredith, 79 Mo. App. 636; Hounett v. Hounett, 39 Ark. 156. (2) A lawful marriage in Illinois was proved by the defendant before the occurrence of the alleged duress. Hutchinson v. Hutchinson, 196 Ill. 432; Alden v. Church, 106 Ill. App. 347; Hooper v. McCaffery, 83 Ill. App. 341. Being lawful there, and not being one of an abhorent nature, it must be recognized as valid here, since our statute does not denounce marriages

performed in other jurisdictions. 1 Bishop, Mar. Div. & Sep., secs. 867-869; Pingree, Extraord. Contr., sec. 400; Medway v. Needham, 16 Mass. 157; VonStroch v. Griffin, 71 Pa. St. 240; Van Voorhis v. Brinthal, 86 N. Y. 18; Stevenson v. Gray, 17 B. Mon. 211-214; State v. Shattuck, 69 Vt. 403; Ross v. Ross, 129 Mass. 243; Phillips v. Madrid, 83 Me. 205; Ponsford v. Johnson, 2 Blatchf. 51; Com. v. Lane, 113 Mass. 458.

*Hiram N. Moore* for respondent.

REYNOLDS, P. J.—Plaintiff below, respondent here, instituted his action on March 15, 1911, in the circuit court of the city of St. Louis, praying the annullment of a marriage contracted with defendant, as plaintiff alleged, on November 2, 1908. The grounds upon which he based his right to relief were, first, that the marriage was the result of duress, and, second, that defendant is a negro, while he is a white person.

Defendant answered by a general denial and the plea of a marriage in Illinois on July 3, 1908. This latter averment was met by a general denial in the reply.

The trial before the court resulted in a decree for plaintiff, from which defendant, after timely but unsuccessful motions for rehearing, appealed to this court.

In rendering the decree the learned trial court found that there was no contract of marriage entered into between plaintiff and defendant in the State of Illinois, and that the contract of marriage entered into between plaintiff and defendant in the city of St. Louis, on November 2, 1908, was without the consent and against the will and wishes of plaintiff, and was the result of duress upon plaintiff, and further found that at the time of the contract of marriage entered into between plaintiff and defendant in the city of St.

Louis, plaintiff was a white person and defendant was a negress.

The evidence as to the alleged marriage in the State of Illinois rests alone upon the testimony of defendant. This Illinois marriage was pleaded as an affirmative defense by defendant, hence the burden was upon her to prove it, plaintiff denying it in the most positive manner and there being no fact or circumstance tending to prove that it had occurred beyond the fact of cohabitation between the parties after that in this State. We may add that there is no corroborative evidence of defendant even as to the alleged fact of cohabitation as man and wife in this State after the alleged marriage in Illinois. On this issue the finding of the trial court is right.

On the issue of duress, on a very careful reading and consideration of the testimony in the case, we find ourselves unable to agree with the conclusion arrived at by the learned trial court that duress has been proven.

The duress relied upon are threats by a brother of this defendant and by her mother. It appears that defendant had a brother who was mentally unsound and, according to the testimony introduced on behalf of plaintiff, this brother had threatened, on several occasions, that if plaintiff did not marry his sister he would kill him, at the time flourishing a shotgun which defendant says was not loaded, and that these threats were communicated to plaintiff on the Saturday preceding the date of the marriage between the parties in St. Louis. It appears, according to the testimony of plaintiff, that the mother of defendant, an old lady some sixty-six years of age, on Sunday, November 1, 1908, accosted him on the street and demanded that he come to their house. He at first refused to go. The old lady told him he had better come; that she was not going to hurt him; would swear she would not hurt him or let anybody hurt him. So he went with

her to her home. When he got there he was taken into a room where defendant was lying in bed seriously sick; that the mother locked the door and told him that if he did not get a priest and marry her daughter, she would kill him or have her son kill him. These are the threats of the mother, made November 1, the day before the marriage. It appears that the son referred to was in the house at the time, but, according to the testimony of defendant, in charge of an attendant, not in the room with plaintiff and defendant and the latter's mother, and that he had no knowledge of plaintiff's presence at the time; nor does it clearly appear that plaintiff himself knew that this son and brother was in the house at the time. At any rate, the son did not come near the room or into the presence of plaintiff; made no threats of any kind to him personally at that time and, as far as the evidence is concerned, had never made any threats to him personally at any time. As to this imbecile brother, it may be further said that he had been known to carry a shotgun and to fire it off on different occasions, had been several times confined to an asylum and was known in the neighborhood as a quarrelsome, violent man in his talk when he was permitted to come home, but there is no evidence whatever in the case that he had ever harmed anybody, or even made any attack on anyone.

These are the threats relied on as constituting duress and as the basis of the claim that the act of consent to the marriage was procured by duress *per minas*.

It may be said that the mother, in the most positive manner, denied making any threats or locking the door of the room, so that this stands on the uncorroborated testimony of plaintiff himself. It may be further noted that the mother, in confirmation of her denial of locking the room door, testified that the house in which this occurred had but one key and that was to the front door, and that she not only did not lock the

door of the room in which the parties were but that they had no lock or key to that door.

We are unable to find any cases in which it is held that acts of this kind constitute duress of such a character as to enable a party to escape from a contract into which he has entered, and the marriage relation, in law, rests on contract. Mere apprehension of physical, or possible physical injury, is not sufficient. It must be fear of that degree of violence, threatened and impending, or actually inflicted, which is sufficient to overcome the mind and will of a person of ordinary firmness.

Duress is defined to be, "A condition which exists where one, by the unlawful act of another, is induced to make a contract or perform or forego some act under circumstances which deprive him of the exercise of free will; a condition of mind produced by the improper external pressure or influence that practically destroys the free agency of a party, and causes him to do an act or make a contract not of his own volition; personal restraint or fear of personal injury or imprisonment; . . . intimidation, or compulsion of another to such an extent and degree as to induce such other person to do or perform some act which he is not legally bound to do, contrary to his will and inclination, . . . or threats of bodily or other harm, or other means amounting to or tending to coerce the will of another, and actually inducing him to do an act contrary to his free will." [14 Cyc., p. 1123.]

Duress *per minas* exists when a person is induced to perform an act to avoid a threatened and impending calamity." [10 Am. & Eng. Ency. of Law (2 Ed.), p. 324, par. C.]

It must be exercised and in force at the time the contract is done or the act entered into. Thus in Holmes v. Hill, 19 Mo. 159, treating of the duress by arrest and imprisonment, it is said (l. c. 170): "If the actions were brought against Hill, in good faith, to re-

cover amounts believed to be actually due from Hill, and after the arrest there was no practice nor contrivance to extort from him, or to induce him to execute an obligation or note for more than the plaintiffs then believed to be due, there was no such abuse of the process as would avoid the note or obligation, although it may be shown that he could have defended himself against the actions in which he was imprisoned.''

In Buchanan v. Sahlein, 9 Mo. App. 552, treating of duress *per minas,* it is said that duress by threats of imprisonment must be such as to excite a reasonable fear of immediate imprisonment.

In Wilkerson v. Hood, 65 Mo. App. 491, the same rule is announced. There, referring to threats of imprisonment, it is said (l. c. 493): ''To amount to such duress, (they) must be of such a character and made under such circumstances as to excite the fears of a reasonably firm person that his imprisonment is imminent and immediate. This court has held that, to constitute duress by threats of imprisonment, the threats must be accompanied with the statement 'that the prosecution had been begun, and that the parties had then the means immediately at hand of procuring the instant arrest and imprisonment of the person threatened,' '' citing Buchanan v. Sahlein, supra.

The law applicable to duress *per minas* is so fully and comprehensively stated in Meredith v. Meredith, 79 Mo. App. 636, that without repeating it here, we refer to the opinion in that case which has many elements in common with the one here involved, and in which it appears that the plaintiff there was in much more imminent danger of violence than was the plaintiff here. The condition in which defendant was at the time plaintiff called on her at the house of her mother was the result of her connection with him, and according to her testimony she was then in imminent danger of death from the effects of treatment

she had undergone at his direction. So there was a strong moral obligation on the part of plaintiff here, as on the plaintiff in that case, to agree to marry and to marry defendant. Our court held, under facts of that kind in the Meredith case, supra, among others, that the father of the girl stood in the room holding loaded pistols, that the plaintiff had not been so far overcome by the threats of another that through fear of loss of his life or of great bodily harm he had consented to marry the defendant; that mere threats and acts of intimidation do not necessarily prove duress, and where the party was under a moral obligation to enter into or discharge a contract, the presumption is that he acted from a sense of moral duty, and this presumption should be weighed in the scale against the evidence of duress. So it was here. These parties had been keeping company for some time and under what defendant claims was a form of marriage gone through with in Illinois, had cohabitated. As a result of it defendant was and had been pregnant. When the mother of defendant summoned plaintiff to the house on the afternoon or evening of Sunday, October 1, 1908, and he was taken into the presence of defendant, according to the testimony of defendant and her mother, he then acknowledged that they had been married previously, but the mother and daughter being of the Roman Catholic faith, the mother insisted that the marriage in Illinois by an unknown party was not sufficient and demanded a marriage by a priest of their own faith. The plaintiff said that he would get a license and bring a priest. He left the house of the family of defendant that evening, the next morning went to the office of the recorder of deeds to procure a license and as the proposed bride was not with him, a clerk accompanied plaintiff from that office to the home of defendant with the marriage license blank. In the presence of defendant, her mother and of plaintiff, and on the direction of plaintiff, the license was filled up,

signed by plaintiff and defendant, and contersigned by the officer and afterwards delivered to the justice, who had been brought to the house by plaintiff for the purpose of performing the ceremony. The gentleman produced was one of the best known justices of the peace of the city of St. Louis. When plaintiff took him to the house, he told the mother, according to her testimony, "here is a priest." The plaintiff and defendant were duly married by the justice in the presence of the mother and the justice, who issued a certificate of the marriage and the license was duly filled up and returned to the recorder's office. There is no pretense that plaintiff had been threatened on that day or on that occasion. To all appearances he was a free actor; the voluntary, the procuring, cause, of the marriage. He was then thirty-one years of age; a man in the full vigor of life. There is no pretense that any threats had been made by the brother within several days of this ceremony, and the last time plaintiff had been told of them was the preceding Saturday, when he claims he was told of these threats on the part of the brother. The ceremony was performed on Monday forenoon.

The residence of defendant and her family was on the rear of the same lot upon which the residence of plaintiff's father and family was situated; in point of fact, defendant's father and mother rented their premises from the father of the plaintiff. So there was nothing whatever to prevent plaintiff from appealing to his own family, to the police, to friends, for protention, or to prevent him from leaving the neighborhood or even the city, and escaping from then carrying out the contract of marriage. The case in this respect is as strong and in many respects very much like the case of Rooney v. Rooney, 54 N. J. Eq. 231. In that case, citing many authorities, the learned vice-chancellor held that there was no duress sufficient to avoid the contract. Guided by authority to which we have

referred very briefly, we cannot sustain the decree of the learned trial judge on the ground that the contract of marriage was entered into under duress.

It is said by our Supreme Court in Davis v. Fox, 59 Mo. 125, that in a suit to set aside a deed on the ground that it had been made under duress, that the verdict for defendant in the trial court sustaining the deed, will not be set aside unless the evidence clearly preponderated in favor of the plaintiff, and that where plaintiff had failed to assert his rights for the space of seven years, it would take an undoubted and conclusive case of duress to authorize a court of chancery to interfere.

In the case at bar the period was not as long, but it was from November 2, 1908, when the marriage was solemnized, and plaintiff did not institute this action to annul this marriage until March 15, 1911.

When we come to the other ground, that is that it was a marriage void under our statute as between persons of white and negro blood, we are equally unable to sustain the finding of the learned trial judge on the ground that plaintiff here, upon whom the burden rests, has most distinctly failed to sustain that issue.

Plaintiff himself, born in this city, is of Italian ancestry. The evidence upon his part to establish the fact that defendant is a negress, rests, first, on his testimony that defendant had admitted that to him. She has denied this admission in the most positive and unequivocal terms. The remainder of the testimony tending to prove race, rests entirely upon that of two or three witnesses, outside of the members of plaintiff's family, who were called as witnesses in his behalf, one a clerk in a store in which defendant had been employed, and another a grocer with whom the family dealt. The latter testified that it was his understanding, and the understanding in the neighborhood, that the family of defendant were negroes. The

Marre v. Marre.

testimony of the salesman as to why he thought defendant was a negress, was because in the department of the store in which defendant had been employed they were in the habit of employing colored girls. He admitted, however, that they had no rule to that effect and did not necessarily confine their employment to negroes. The grocer's testimony was based upon neighborhood gossip—talk; when pressed to give the names of persons who he had heard say defendant's family were negroes, he named one man. He further based his own opinion upon the one fact that upon one occasion he had taken a trunk from the home of defendant to a house in which he saw some negroes, had delivered it to a negro who opened the door, and had afterwards gone to that house for the trunk and a negro girl had given it to him. Defendant did not live there. Defendant, testifying as to this, said that a young colored woman, a friend of hers and a school teacher in a negro public school, had borrowed the trunk from her and that at her request she had sent the trunk to this school teacher's residence, and when the use of it no longer existed had sent for it and had it taken back home. There was some evidence that defendant was acquainted with one or more teachers of negro schools in this city and was on friendly terms with them; there is no evidence of an intimate association with any of them. The members of the family of plaintiff testified that they had seen negroes go to the house of defendant's mother; had seen a sister, on one occasion, walking on the street with a negro woman, and that they considered defendant's family negroes. Defendant herself testified that she had been sent, when seven of eight years of age, to a Roman Catholic institution for the education of girls; had remained there until she was fourteen years of age, and that it was an institution at which negroes were not received. It did appear, however, that at this

184 Mo. App.—14

institution she and her family were enrolled as Indians.

The mother of defendant testified in the most positive terms that there was no negro blood in the family, in the veins of herself, her husband or her children; her family had lived in Kentucky and in Mexico; two or more of her daughters are married to white men; their associates are with white people, not with negroes, although they had a few friends who are negroes. One of her immediate ancestors was a Mexican. It crops out through the testimony in this case, although not positively in evidence, that defendant had not brought forward their white associates in the city, because of shame over this attack which had been made upon her by plaintiff; that the family was anxious to avoid publicity. The mother disclosed the names and residences of her daughters who had married white men, and it was in evidence that two or more of them had done so, only under the compulsion of the court.

The burden was upon plaintiff to make out his case. In the face of this affirmative testimony in behalf of defendant on this point, a point so vital to the maintenance of this important feature in the case of the plaintiff, and of the exceedingly vague, indefinite and unconclusive evidence on it on behalf of plaintiff, it is impossible to say that plaintiff has made out his case by the preponderance of testimony. The preponderance and the weight of it is decidedly against him on this question of diversity of race. Here, we, as an appellate court, weigh the evidence. [Meredith v. Meredith, supra.]

It is held by the Court of Appeals of Kentucky, in Gentry v. McMinnis, 3 Dana 382, l. c. 386 et seq., that color is in itself no proof of blood. So the Supreme Court of California held in People v. Hall, 4 Calif. 399.

We must bear in mind that the prohibition of the statute is not against color, but blood, or race.

Even grant that there is a trace of negro blood in this defendant, there is no evidence that it amounts to one-eighth, and section 4727, Revised Statutes 1909, in penalizing marriages between whites and negroes, defines a negro as one "having one-eighth part or more of negro blood." Learned counsel for respondent argues that as section 8280 pronounces marriages between negroes and whites void, but does not define the term "negro," that any drop of African blood makes one a negro. We think this is an incorrect assumption. When the lawmaker, by section 4747, defined what amount of blood made one a negro, it is hardly to be supposed that when they used the word "negro" in section 8280, it intended to change the text. The two sections are to be construed together. [State v. Melton and Byrd, 1 Busbee (N. C.) 49, l. c. 51.] Other courts, with statutes like our own forbidding intermarriage of whites and negroes, exclude from the latter persons with much more than one-eighth negro blood. Thus in North Carolina it is held that the word "negro" includes only persons of color within the third degree. [State v. Melton et al., supra.] So, too, it is held in Alabama. [Linton v. The State, 88 Ala. 216.] In Virginia the word "negro" only applies to those having one-fourth or more of African blood. See McPherson v. Commonwealth, 28 Gratt. 939, where it is also said (l. c. 940) that if there is present "but one drop less (than one-fourth), she (the woman) is not a negro." So it is held in Kentucky in Gentry v. McMinnis, supra.

On the tests of what constitutes a negro, as defined by the courts and the law, there is not a particle of tangible evidence in this case, even if we disregard that of defendant, on which it can be held that this defendant is a negro or, speaking accurately, a negress.

Another reason that leads us to the conclusion we have reached in this case is, that in this action, like in all actions in which a court of conscience is applied

to for relief, plaintiff must appear with clean hands.
That this is an action in equity, see Meredith v. Meredith, supra. That rule applies as well to a case seeking to annull a marriage that is void by the statute as to any other contract. We are aware that the rule in the English courts is different. There matters of this kind were under the control of the ecclesiastical courts. But that rule does not apply in the majority of American courts and it distinctly does not apply in our State, as see Meredith v. Meredith, supra.*

In 1 Bishop on Marriage, Divorce and Separation (Ed. 1891), sec. 722, it is said: "In most circumstances, the law estops a party to allege in a court of justice his own wrong. Therefore one cannot maintain a suit to have his marriage set aside on the ground that it was contracted through his own fraud, though in law it is in substance void." So it is held in Rooney v. Rooney, supra. Citing in support of this, among others, Tefft v. Tefft, 35 Ind. 45, and Fuller v. Fuller, 33 Kan. 582, the vice-chancellor says (l. c. 243): "I think the weight and tendency of American authority are against affording affirmative relief to a person situate as the complainant is here." As before remarked,

---

*Note by REYNOLDS, P. J.
In the United States the chancery courts—courts of equity—of the several States, with one or two exceptions, have always assumed jurisdiction in like causes—that is, suits brought to annul marriages, and applied to them the rules governing suits in equity brought to annul contracts. This in contradistinction to the practice of the English courts of chancery, where, prior to more recent legislation, jurisdiction over such causes belonged exclusively to the ecclesiastical courts. No such courts existing in this country, it was held at an early day that their jurisdiction "reverted" to the lay courts, that is, courts of equity. [See Wightman v. Wightman, 4 Johns. Chy. 343; Ferlat v. Gojon, 1 Hopkins Chy. 478; Rooney v. Rooney, supra; Avakian v. Avakian, 69 N. J. Eq. 89, affirmed 69 N. J. Eq. 834. See, also, 26 Cyc. 908, note 8 and cases there cited.] The courts of our own State, as appears by the cases cited in the body of the opinion, have, without question, exercised jurisdiction in such cases.
I am indebted for citation to the above authorities to a very able opinion delivered by Judge Lobinger in Cavanagh v. Worden, in the United States Court for China, published in Annual Bulletin Comparative Law Bureau, Am. Bar Assn. (July 1, 1914), p. 45.

the facts in the Rooney case bear marked resemblance to the facts in the case at bar.

On consideration of all the evidence in the case and of the decisions which we have very briefly referred to as applicable to a case of this kind, we do not think that plaintiff here has shown himself entitled to the relief for which he prays and which was awarded him by the trial court. Whatever remedy these parties may have, if their relations continue as they now appear to be, is on the divorce, not on the chancery side of our courts.

The judgment of the circuit court in this case is reversed. *Nortoni* and *Allen, JJ.*, concur.