In re Marriage of Sharon SUMNERS and Jerry L. Sumners.

Sharon SUMNERS, Plaintiff-Appellant,

v.

Jerry L. SUMNERS, Defendant-Respondent.

No. 12568.

Missouri Court of Appeals, Southern District, Division Two.

Jan. 3, 1983.

Motion for Rehearing or Transfer Denied Jan. 24, 1983.

Application to Transfer Denied Feb. 23, 1983.

Meredith B. Turner, Lynn E. Heitman, Turner, Reid, Duncan & Loomer, P.C., Springfield, for plaintiff-appellant.

Donald E. Bonacker, Bonacker & Reynolds, P.C., Springfield, for defendant-respondent.

G. Michael Baker, Springfield, Guardian ad Litem.

HOGAN, Judge.

This is an action to dissolve a marriage. By amended answer filed with leave of court, defendant Jerry Lee Sumners challenged the jurisdiction of the court over the subject matter of the action. The trial court heard and determined the matter as provided by Rule 55.27(c). It concluded the parties' marriage was void and dismissed the action. Plaintiff appeals.

The defendant has been married four times. He married Alma, his first wife, by whom he has two children, in Kansas in September 1955. Defendant and Alma were divorced on December 30, 1957, but were remarried in Oklahoma the following month. Defendant and Alma were again divorced in Kansas on September 29, 1961. At some time in 1961, defendant moved from Wichita to Omaha. He married Patricia O'Neil in Nebraska on December 12, 1961. Patricia sued the defendant for divorce in the District Court of Douglas County, at Omaha, in 1963. On October 18, 1963, that court entered a default decree awarding Patricia an "absolute divorce." The decree concludes: "IT IS FURTHER ORDERED THAT NEITHER PARTY TO THIS DIVORCE MAY REMARRY WITHIN SIX MONTHS OF THE DATE OF THIS DECREE." Defendant testified he received a copy of this decree shortly after it was entered. The record is entirely silent concerning Patricia after the divorce; it may be inferred from the Nebraska decree that she was present when that decree was entered on October 18, 1963.

The defendant began courting the plaintiff in July or early August 1963. The ardor of their courtship increased, and plaintiff became defendant's paramour approximately 1 month after the decree was issued. Plaintiff's knowledge of the terms of the decree was made an issue on trial. We do not regard her appreciation of its effect controlling. It is fairly inferable that she became aware of its content during the early years of the parties' marriage, but we regard the defendant's knowledge of the prohibition against remarriage as superior to hers. Nebraska law would charge defendant with knowledge of the terms of the decree. Cf. *Loringer v. Kaplan,* 179 Neb. 215, 137 N.W.2d 716, 718–719[4, 5] (1965).

Defendant proposed marriage to the plaintiff "[f]ormally with a diamond ring on December 14th of 1963." The parties immediately made plans to be married in Iowa, even though they were residents of Omaha and intended to remain in Nebraska. They finally decided to be married at a church 250 miles east of Omaha. The church is designated the "Little Brown Church in the Vale." Both parties testified the name of the church had romantic appeal. With deference, we think candor was better served by defendant's answer when

he was closely cross-examined about the parties' choice of matrimonial forum. Defendant testified that he and the plaintiff had discussed a plan to be married and chose the church in Iowa because "there was a waiting period in the State of Nebraska, and when [plaintiff] come [sic] up pregnant, naturally, she was going to show, and we didn't want her friends and everyone else to know that we had to get married. So, in my own way of thinking, going into the State of Iowa, I thought we [would] legally, to a point, be married, because I knew there was a waiting period in Nebraska." A marriage ceremony was performed at the "Little Brown Church in the Vale," in Chickasaw County, Iowa, on January 31, 1964, a little more than 3 months after defendant's divorce from Patricia.

The parties lived together in Nebraska as husband and wife from the date of their marriage in 1964 until November 15, 1968. In 1968 they moved to Lawrence County, Missouri, and thereafter lived together as husband and wife, except for one period of separation, until they were finally separated on February 23, 1980. Proof of the parties' cohabitation is abundant; they are the natural parents of a son born August 18, 1964, another son born October 4, 1965, a third son born December 22, 1967, and a daughter born December 23, 1974. All these children have attended school in Missouri and have been held out as the parties' children. Since 1965, the parties have filed joint income tax returns as husband and wife; they have acquired several parcels of realty as tenants by the entirety.

The course of the litigation is, to a degree, informative. The petition for dissolution was filed in Lawrence County on April 25, 1980. Defendant filed a timely answer on May 9, 1980, admitting the existence of a lawful marriage between him and the plaintiff and averring the execution of a "separation agreement" in July 1976. Prayer of the answer was for dissolution of the marriage, distribution of the marital property "and the proceeds thereof" described in the separation agreement, *as provided in the said agreement,* and for distribution of the "remainder" of the marital property. Con-

temporaneously, the defendant filed an application for a change of judge; on June 25, 1980, another judge was assigned to hear the cause.

On September 8, 1981, plaintiff filed a reply, denying the existence of any separation agreement "which applies to the current proceeding." Plaintiff further averred that after the parties separated in July 1976, they were thereafter reconciled and lived together as husband and wife, and alternatively alleged that the agreement was "unconscionable, and was entered into by [plaintiff] under duress." On October 6, 1980, plaintiff filed a motion for temporary allowances; this motion was heard and taken under advisement on January 7, 1981. On February 6, the trial judge entered an elaborate order awarding temporary allowances to the plaintiff, and on May 8, 1981, disqualified himself. On July 15, 1981, a third judge was assigned to hear the cause. On September 16, 1981, the defendant moved to file an amended answer, alleging that when the original answer was filed in May 1980, counsel was unaware of the provisions of Nebraska law but that subsequent research had disclosed that the defendant's Nebraska divorce did not terminate his marital status for 6 months. The amended answer sets up in paragraph 7 that "[t]he parties were never married" because at the time the Iowa ceremony was celebrated, the Nebraska decree had not become final and therefore the Iowa marriage was void. The defendant was permitted to file this amended answer, and a hearing was held to determine the parties' marriage status on November 10, 1981. On November 23, 1981, the cause was dismissed.

The legal file discloses that while the cause was pending and between May 9, 1980, and November 23, 1981, when the judgment of dismissal was entered, two sets of interrogatories were filed by each party. Both sets were answered. With few exceptions, the questions propounded in the interrogatories have to do with the property and property records in possession of one or another spouse. The separation agreement,

aside from the recital that the parties are husband and wife, is remarkable only because it assigns to the defendant the parties' most productive source of income, the defendant's interest in a Nebraska corporation known as Service Vending Corporation. We have recited the procedural facts only to give cast or color to the basic nature of the controversy before the trial court and the appeal before this court. We would carefully note and have it most clearly understood that we suggest no impropriety whatever upon the part of the defendant nor his counsel; the fact of lawful marriage is jurisdictional. We do believe, though we cannot be sure, that the real matter in issue is the same matter presented in most dissolution appeals: The award and distribution of marital assets.

■ When the validity of a marriage has been assailed in a divorce or other proceeding, our courts have applied a rule of law called a "presumption." At least since 1860, Missouri has consistently adhered to the presumption that a second or subsequent marriage is valid. *Klein v. Laudman,* 29 Mo. 259, 261 (1860). Sometimes it has been said that the presumption is a "presumption of law." The nature and incidents of the presumption were stated at length by our Supreme Court in *Carr v. Carr,* 232 S.W.2d 488, 489 (Mo.1950):

> "Defendant, who asserted the invalidity of his marriage to plaintiff, had the burden of proof upon the issue, even though the issue required proof of a negative fact difficult to prove. . . . And where a valid first marriage has been shown, as in the instant case, it may be presumed that, at the time of the second marriage, the first marriage had been dissolved, either by a decree of divorce, or by the death of the former spouse. . . . The presumption of the validity of the last marriage may be repelled only by the most cogent and satisfactory evidence. . . ."

Other cases stating the nature, incidents and force of this presumption are: *Osmak v. American Car & Foundry Co.,* 328 Mo. 159, 40 S.W.2d 714, 77 A.L.R. 722 (1931);

*Maier v. Brock,* 222 Mo. 74, 120 S.W. 1167, 133 Am.St.Rep. 513, 17 Ann.Cas. 673 (1909), and *Forbis v. Forbis,* 274 S.W.2d 800, 806–807[16–20] (Mo.App.1955). See, generally, Annot., 14 A.L.R.2d 7 (1950).

The defendant relies, primarily, upon the statutory law of Nebraska. At the time defendant was divorced from Patricia O'Neil, Nebraska law provided that a divorce did not become final or operative until 6 months after trial and decision, R.S. 42–340 (1943), and the Supreme Court of Nebraska quite uniformly held that a decree of divorce rendered in Nebraska did not operate to terminate the marital status for 6 months. *Scott v. Scott,* 153 Neb. 906, 46 N.W.2d 627, 631–632, 23 A.L.R.2d 1431, 1435–1436 (1951); *Shinn v. Shinn,* 148 Neb. 832, 29 N.W.2d 629, 633[4] (1947). His principal argument both here and in the trial court is that because the Nebraska decree did not operate to dissolve the marital status for 6 months and he remarried within the interlocutory period, his marriage to the plaintiff is polygamous and void.

■■ The hiatus in the defendant's argument and in his proof is that neither the trial court nor this court has been presented with any evidence tending to show what became of Patricia O'Neil after the decree was rendered. The Nebraska decree recites that Patricia appeared in court on October 18, 1963, and we suppose this recital may be taken as proof she was alive at that time. Nonetheless, plaintiff and defendant were not married until January 31, 1964. The defendant argues that when a person is shown to be alive at a given time the law presumes that he remains alive until the contrary is shown, or, in the absence of proof, a different presumption arises. Such is indeed the law in this state. *Basman v. Frank,* 250 S.W.2d 989, 994–995 (Mo.1952). However, it has been held by our courts and others that when the presumption of the validity of a marriage conflicts with the presumption of the continuance of life, and there are no circumstances in evidence to aid the presumption of continued life, the presumption of validity of the marriage is stronger and will prevail. *Maier v. Brock,*

supra, 222 Mo. at 90–91, 120 S.W. at 1170; *Johnson v. St. Joseph Terminal Ry. Co.,* 203 Mo. 381, 409–410, 101 S.W. 641, 648–649 (1907); *Briggs v. United States,* 116 Ct.Cl. 638, 90 F.Supp. 135, 143–145[14, 15] (1950); 9 H. Wigmore, Evidence § 2506 (Chadbourn rev. 1981). See also Annot., supra, 14 A.L. R.2d at 41–44 § 15. In this case, there is no evidence to aid the presumption of continued life; there is no basis for any inference that when she and defendant finally separated, Patricia was in robust health; there is, indeed, no basis for any factual conclusion other than that Patricia was alive on October 18, 1963. The defendant has failed to sustain his burden to show that he had a wife living when he married the plaintiff.

Neither would it be decisive if, upon remand, defendant were able to adduce proof that Patricia O'Neil was seen alive and healthy after he married the plaintiff. What the defendant actually relies on, in this case, is not the invalidity of his marriage, but the ineffectiveness of his divorce. Such position is taken after defendant has cohabited with plaintiff as his wife for 16 years, with one period of separation, has sired four children by the plaintiff and has judicially admitted, though not conclusively, that the plaintiff is his lawful wife. It is generally recognized that a person may be precluded from attacking the validity of a foreign divorce decree if, under the circumstances, it would be inequitable for him to do so.[1] The position of the American Law Institute is that:

> "... In general, it may be said that a person who obtains a divorce and then remarries will not be permitted to attack the validity of the divorce in order to free himself from his obligations to his second spouse or in order to claim an inheritance from the estate of the first spouse...."
> Restatement (Second) of Conflict of Laws § 74, Comment b.

In Missouri, this rule of preclusion or estoppel has been applied to prevent one spouse from claiming an inheritance or interest in the estate of a deceased spouse. See, e.g., *Crane v. Deacon,* 253 S.W. 1068, 1072–1073[10] (Mo.1923) (husband sought to prove his divorce collusive in order to claim share of deceased wife's estate); *Buffington v. Carty,* 195 Mo. 490, 499, 93 S.W. 779, 780 (1906) (lapse of time prevented equitable claim to an interest in the property of former wife from whom plaintiff was invalidly divorced). Other examples of preclusion could be cited, as, for example *Marre v. Marre,* 184 Mo.App. 198, 211–212, 168 S.W. 636, 640–641 (1914) (husband sought to annul allegedly miscegenational marriage; voluntary cohabitation for three years prevented plaintiff from appearing with "clean hands"). Perhaps the most straightforward application of the principle of law we have in mind was made in *Littlefield v. Littlefield,* 199 Mo.App. 456, 203 S.W. 636 (1918). There the court held that remarriage, perhaps with knowledge that her divorce was invalid, precluded the plaintiff from asserting a claim to her former husband's property.

We are not particularly concerned, however, with establishing that our courts have, in the past, called the preclusion an "estoppel." What we have in mind is the principle that "the person who produced the misleading situation cannot, as against persons who may (or may not) have thought the divorce to be valid, set up its invalidity when later that invalidity seems advantageous to him." Leflar, supra, § 226, p. 461. This statement comports with the Restatement view that the rule of preclusion applies when, under the circumstances, it would be inequitable to permit a particular person to challenge the validity of a divorce decree. Restatement (Second) of Conflict of Laws § 74, Comment b.

This notion of preclusion, or estoppel, or quasi-estoppel to which the quoted authorities speak was elucidated in *Spellens v. Spellens,* 49 Cal.2d 210, 317 P.2d 613 (1957). The facts are somewhat different from those presented here, but there is some

---

1. See, generally, Restatement (Second) of Conflict of Laws § 74 (1971); R. Leflar, American Conflicts Law § 226 (1977) [hereinafter Leflar]; H. Clark, Estoppel Against Jurisdictional Attack on Decrees of Divorce, 70 Yale L.J. 45 (1960).

similarity in that the parties had entered into a marriage of questionable validity after the wife obtained an interlocutory decree which did not dissolve the wife's former marital status. The court stated, in the course of its opinion, 317 P.2d at 618–619:

"... The theory is that the marriage is not made valid by reason of the estoppel but that the estopped person may not take a position that the divorce or latter marriage was invalid.... 'To hold otherwise protects neither the welfare nor morals of society but, on the contrary, such holding [would be] a flagrant invitation to others to attempt to circumvent the law, cohabit in unlawful state, and when tired of such situation, apply to the courts for a release from the indicia of the marriage status' ... [and] [f]rom a pragmatic viewpoint, judicial invalidation of irregular foreign divorces and attendant remarriages ... is a [wholly ineffective] sanction against an institution whose charm lies in its immediate respectability...."

See also *Krause v. Krause,* 282 N.Y. 355, 26 N.E.2d 290 (1940).

This "estoppel" doctrine has been applied in many jurisdictions in widely variant factual situations. See: *Higgins v. Higgins,* 266 Ark. 953, 588 S.W.2d 454, 455–456[1–3] (Ark.App.1979); *Warner v. Warner,* 76 Ida. 399, 283 P.2d 931, 935–936[4][5] (1955); *In re Marriage of Gryka,* 90 Ill.App.3d 443, 45 Ill.Dec. 820, 413 N.E.2d 153, 155[3] (1980); *Poor v. Poor,* 381 Mass. 392, 409 N.E.2d 758, 761[2] (1980); *Attebery v. Attebery,* 172 Neb. 671, 111 N.W.2d 553, 555[1] (1961) (recognizing the principle); *Kazin v. Kazin,* 81 N.J. 85, 405 A.2d 360, 365–366 (1979); *Bartsch v. Bartsch,* 204 Va. 462, 132 S.E.2d 416, 420–421[1][2] (1963). While such an approach to the merits of this appeal would be less satisfactory than resolution upon the principle that the presumption of validity has not been dispelled, it has the virtue of consonance with established constitutional and conflict of laws principles. It has been held, and we believe, that U.S. Const. Art. IV, § 1 and its implementing legislation, 28 U.S.C.A. § 1738, compel us to recognize foreign divorce decrees as they relate to the marital status, *Urbanek v. Urbanek,* 503 S.W.2d 434, 439[2] (Mo.App.1973), and as we tried in wholly inappropriate language and with minimal success to explain in *Marriage of Bradford,* 557 S.W.2d 720, 726–727[9] (Mo.App.1977), 28 U.S.C.A. § 1738 requires us to give a foreign divorce decree that effect upon the marital status which it would have in the state where the decree was rendered. The preclusion rule of the Restatement does no violence to this requirement. A judgment by estoppel does not validate a void marriage contracted before an interlocutory decree has dissolved the marital status; it only estops a party or the parties from attacking the validity of the foreign decree if it would be inequitable for him—or them—to do so.

▓ Moreover, in this case, the application of orthodox principles of conflict of laws leads us to the same conclusion we have reached by applying the presumption that the marriage was valid. The validity of the marriage in the first instance must be determined by looking to the law of the state where it was contracted. *Hartman v. Valier & Spies Milling Co.,* 356 Mo. 424, 432, 202 S.W.2d 1, 5 (1947). If we assume that Iowa would not recognize the marriage because the Nebraska decree had not terminated defendant's marital status, ordinary principles of choice of law would require us to look to Iowa's rules of conflict of laws. Leflar, supra, § 220, p. 445, n. 3. When we do so, we find that Iowa clearly holds it is the law of the forum which determines whether a party is estopped to attack the validity of a foreign divorce decree. *In re Marriage of Winegard,* 278 N.W.2d 505, 509–510[4][5] (Iowa 1979), cert. denied sub nom. *Winegard v. Gilvin,* 444 U.S. 951, 100 S.Ct. 425, 62 L.Ed.2d 321 (1979); *Swift v. Swift,* 239 Iowa 62, 29 N.W.2d 535, 539[11–13][14] (1948). The parties are domiciled here, and this court would hold the defendant estopped to deny the efficiency of the Nebraska decree even if it were shown that Patricia was alive and well when the parties were married in Iowa.

As the record lies before us, we hold the defendant failed to rebut the presumption that the parties' marriage was valid. The trial court erroneously applied the law to the facts, the judgment of dismissal is reversed and the trial court is directed to reinstate the cause on its docket.

MAUS, P.J., and PREWITT, J., concur.