STEVEN H. WATSON, Petitioner

v.

ROSALIE T. WATSON, Respondent

High Court of American Samoa
Trial Division

DR No. 32-88

April 24, 1989

Before REES, Associate Justice, TAUANU'U, Chief
Associate Judge, and VAIVAO, Associate Judge.

Counsel: For Petitioner, William Reardon

Petitioner seeks an annulment of his marriage
to respondent. He alleges that at the time of this
marriage respondent had a lawful and living spouse.

## I. Facts

Although respondent did not appear, the Court
held an evidentiary hearing as required by A.S.C.A.
§ 42.0205. Petitioner presented a copy of what
appears to be a final judgment of divorce in favor
of respondent against one Rodney Carter. The
judgment was rendered in California; although it
states that jurisdiction was obtained over Carter
by service of process on October 5, 1979, the
judgment itself was not rendered until 1985. The

31

purported marriage of the present parties took place on December 6, 1980, in American Samoa.

Petitioner did not wish to present any further evidence. The Court, pursuant to the responsibility imposed by A.S.C.A. § 42.0205, inquired about the circumstances of the marriage whose annulment is now sought. Petitioner testified, in response to the Court's questions, that he had known at the time of his purported marriage to respondent that she was already legally married to Carter; and that he had lived with her as man and wife both before and after her 1985 divorce from Carter.

Asked by the Court if he wished to say anything about his state of mind during these events, the petitioner declined to do so. His attorney interposed that since the marriage is "void ab initio," petitioner is entitled to an annulment regardless of his culpability or lack thereof.

The Court then expressed its uncertainty on this point of law and asked petitioner, who is himself a licensed attorney, whether he wished to rely entirely on the argument of his counsel rather than to present evidence tending to mitigate the effect of his own prior knowledge that his marriage was bigamous. Petitioner declined to present further evidence, and the case was then taken under advisement.

The Court is therefore constrained to decide this case without a clue about what the parties had in mind when they contracted this marriage and carried it on for over seven years.

Perhaps even more important, we know very little about the California divorce action on which petitioner rests his case. The judgment submitted in evidence is a one-page form containing no findings or conclusions about the marriage between the present respondent and her former husband. The most interesting piece of information on the page, for the purpose of the present proceeding, is that petitioner filed for divorce against Carter at some time before October 5, 1979 --- over a year before the purported marriage of the present parties. A final judgment did not issue, however, until about six years later. We are informed that the action was "default or uncontested," that it was heard "by

declaration" (i.e., on affidavits rather than live testimony), and that a Marital Settlement Agreement was incorporated by reference. We have no copy of this agreement; it might have been made shortly before the final judgment (in 1985) or at around the time suit was filed (in or before 1979) or when the parties separated (at some unspecified earlier time). The copy of the judgment presented to us refers to six pages of attachments, but these have not been introduced into evidence.

One important fact that we do not know is when, if ever, an interlocutory judgment was granted in the California action. Prior to 1983 the law of California provided for a two-stage divorce process. After the Court had heard the case and determined that the parties were legally entitled to a dissolution of their marriage, it issued an "interlocutory" judgment. After six months either party could move for a "final" judgment, or the Court could issue such a judgment on its own motion.[1] The evidence before us, to the effect that respondent's suit against Carter was filed in 1979 and a final judgment issued in 1985, is in no way inconsistent with the issuance of an interlocutory divorce in 1979 or 1980.[2]

Nor, for that matter, is the evidence before us dispositive of the question whether Carter obtained an absolute divorce in another proceeding before December, 6, 1980. We do not even know for a fact that Carter was alive on that day.

_____

[1] See California Civil Code §§ 4512, 4514 (prior to 1983 amendment). The pre-1983 law also specifically provided that a final judgment could be granted nunc pro tunc so as to have retroactive effect from six months after the date of the interlocutory judgment. Id. § 4515 (prior to 1983 amendment). The main purpose of providing for retroactive divorce judgments was to allow for the validation of technically bigamous marriages that were contracted after an interlocutory divorce from a prior marriage but before the entry of a final judgment. See In re Estate of Casimir, 97 Cal. Rptr. 623 (Cal. App. 1971).

[2] The interlocutory divorce judgment established "entitlement" to a dissolution, but did not render the parties free to marry. Nevertheless, the California courts would not annul a subsequent marriage contracted after the interlocutory judgment --- at least not at the suit of a party who had freely contracted the second marriage with knowledge of the facts. See Spellens v. Spellens, 317 P.2d 613 (Cal. 1957).

33

## II. The Presumption that a Marriage is Valid

Rarely does the law impose on a party the burden of proving that an event did not happen. One who attacks the validity of a marriage, however, assumes the task of overcoming "one of the strongest presumptions of the law." Reed v. Reed, 43 S.E.2d 539, 543 (Ga. 1947). This presumption arises

> because the law presumes morality and not immorality; marriage and not concubinage; legitimacy and not bastardy. The presumption arises . . . by virtue of the proof of the ceremonial marriage between the parties, and proof of their cohabitation as man and wife . . . .
>
> "The presumption as to the validity of the marriage can only be negatived by disproving every reasonable possibility. . . ." The invalidity of the marriage attacked must be shown by clear, distinct, positive, and satisfactory proof.

Id. at 542-43, quoting Brown v. Parks, 160 S.E. 238, 240 (Ga. 1931). See also, e.g., Williamson v. Williamson, 101 A.2d 871 (Del. Super. 1954); Smith v. Smith, 185 P. 67 (Idaho 1919) (proof that former marriage had not ended "must be so cogent and conclusive as to fairly preclude any other result"); Carr v. Carr, 232 S.W.2d 488, 489 (Mo. 1950) ("The presumption of the validity of the last marriage may be repelled only by the most cogent and satisfactory evidence . . . ."); Smith v. Smith, 131 P.2d 447 (Or. 1942); Harsley v. United States, 187 F.2d 213 (D.C. Cir. 1954) ("the rebutting evidence must be strong, distinct, satisfactory and conclusive"); Pritchard v. Purcell, DR No. 65-88, 11 A.S.R.2d 16, 23 & n.7 (1989).

The presumption that the latest marriage is valid displaces any presumption of the continuation of an earlier marriage, and even the presumption of the continuation of the life of the first spouse. The net result is that "there is a presumption that the earlier marriage was dissolved by death or divorce before the later one was contracted." C.

34

_McCormick, Handbook on the Law of Evidence_ § 312 at 254 (1954).

The best way to rebut this presumption is to have both parties to the earlier marriage present in court to testify that they were not divorced prior to the later marriage. _See, e.g._, _United States v. Burns_, 95 F. Supp. 628, 630 (E.D. Ark. 1951). It often happens, however, that at least one party to the earlier marriage is not available to testify. The presumption of death or divorce is therefore most often rebutted by competent and convincing evidence that (1) the absent party to the first marriage has been seen or heard from after the date of the second marriage; (2) the other party to that marriage never filed for divorce and never was served with divorce papers prior to the date of the second marriage; and (3) a search of the records of every jurisdiction in which either party to the former marriage has lived yields no record of any divorce. _See, e.g._, _Smith_, _supra_, 131 P.2d at 448; _Jordan v. Copeland_, 131 So.2d 696 (Ala. 1961); _Teel v. Nolan Brown Motors, Inc._, 93 So.2d 874 (Fla. 1957); _In re Marriage of Sumners_, 645 S.W.2d 205 (Mo. App. 1983); _Marcum v. Zaring_, 406 P.2d 970 (Okla. 1965); _In re Pilcher's Estate_, 197 P.2d 143 (Utah 1948); _Parker v. American Lumber Co._, 56 S.E.2d 214 (Va. 1949); _Dixon v. Gardner_, 302 F. Supp. 395 (E.D. Pa. 1969). _See generally_ _H. Clark, The Law of Domestic Relations in the United States_ § 2.7 at 69-70 (1968).

"There is agreement that testimony by one spouse that he never got a divorce, that he never received service or notice of divorce proceedings by the other spouse, and never was guilty of conduct which would be grounds for divorce is not enough to rebut the presumption." _Id_. at 69; _see, e.g._, _Jordan_, _supra_; _Teel_, _supra_; _In re Pilcher's Estate_, _supra_; _Marsh v. Marsh_, 250 P. 411 (Cal. App. 1926); and cases cited in _H. Clark_, _supra_, at 69 n.33. For the same reason, evidence that one party to the first marriage procured an invalid divorce, or procured a divorce at some time after the date of the second marriage, has been held insufficient; for it does not negate the possibility that the absent spouse had procured a valid divorce, with or without actual notice to the other, before the second marriage began. _See Smith_, _supra_, 185 P. at 69; _Reed_, _supra_, 43 S.E.2d at 543; _Missouri Pacific R.R. v. Harris_, 120 S.W.2d

35

695 (Ark. 1938); Boulden v. McIntire, 21 N.E. 445 (Ind. 1889); Stokes v. Heckler, 773 F.2d 990 (8th Cir. 1985); cf. Williamson v. Williamson, 101 A.2d 871 (Del. 1954). Although a later divorce has occasionally been found sufficient to rebut the presumption of an earlier one, in such cases the courts have had evidence of the other party's whereabouts and activities which was apparently found sufficient to support an inference that he or she did not obtain a valid divorce prior to the second marriage. See Fowler v. Fowler, 79 A.2d 24 (N.H. 1951); Cartwright v. McGown, 12 N.E. 737 (Ill. 1887).

In this case the record tells us next to nothing about the absent Carter, and precious little about the present petitioner and respondent. We do not know when Carter and the respondent were married or when they were separated. The latter event could have happened just before the divorce was filed in 1979, or it could have happened ten years earlier. We do not know where Carter and respondent lived during the marriage or where either of them went after the separation.

We can infer from the divorce judgment only that one or the other of them was domiciled in California in 1979. We also know that the respondent was married in American Samoa late in 1980. Carter and the respondent may or may not have known how to get in touch with each other during the years after their separation. Our record does not reflect whether Carter had actual notice of the divorce proceedings or whether he was served in absentia by publication.

We can reasonably assume that the respondent did not procure a divorce before 1985, for it would make no sense for her to divorce Carter twice. We will even infer, from the fact that respondent went to the trouble of getting a divorce and that the California court granted her one, that respondent and Carter were at one time legally married.[3] We also infer from respondent's actions in filing the suit and bringing it to judgment that she had no

---

[3] But see Williamson, supra, 101 A.2d at 873 (Capacity of parties to the first marriage ceremony to contract a valid marriage was not put at issue in their divorce action; divorce judgment therefore did not constitute evidence, in suit to annul second marriage, that first marriage was valid.).

notice of any prior divorce action brought against her by Carter. This is clearly insufficient, however, to establish that no such action was ever brought. See, e.g., Reed, supra; H. Clark, supra, § 2.7 at 169 n.33, and authorities cited therein.

We can conclude nothing further from the California divorce judgment. We are bound to give the judgment full faith and credit, but only insofar as it actually or necessarily resolved questions now before us. In her divorce action petitioner had only to prove the fact of her marriage, the domicile of one of the parties in California, and that either "irreconcilable differences" or "incurable insanity" had transpired. See Calif. Civil Code § 4506. Such proof would not have been inconsistent with the parties' long having lost contact with each other.

In the California proceeding, unlike this one, there was no affirmative duty to disprove a prior divorce or to prove that Carter was still alive. In that action the law presumed the continuation of life and of marriage; in this action it strongly presumes the opposite. From the fact that a divorce was granted, without any evidence of the findings or conclusions on which it was based, we can conclude only that neither a prior death nor a prior divorce affirmatively appeared on the record. Neither do they appear on the present record; but the petitioner has the burden of affirmatively disproving them, and cannot do so on the strength of a judgment that did not depend on their being affirmatively disproved. See Williamson, supra, 101 A.2d at 873, and authorities cited therein.

Nor, finally, does the fact that Carter was served with process in October of 1979 establish that he was alive in December of 1980. See, e.g., In re Marriage of Sumners, supra, 645 S.W.2d at 208-09 (appearance in court by spouse did not prove that she was alive three months later). Indeed, since we are not told whether Carter was served in person or by publication, we cannot even say whether he was alive in 1979. Petitioner had the burden of proving by "the most cogent and satisfactory evidence" that respondent had a spouse living when she married petitioner. Carr, supra, 232 S.W.2d at 489. He presented no evidence to sustain this burden.

The presumption that the latest marriage is valid, and the rule that it can be rebutted only by conclusive proof of two universal negatives, undoubtedly results in many adjudications that seem inconsistent with the true facts as they are privately known to the parties and their acquaintances. If we had only to determine what probably happened, we might well conclude even on the scant evidence before us that Carter was probably alive in 1980, as were the great majority of people against whom divorce actions were filed in 1979. We would also feel comfortable concluding that a man whose wife divorced him in 1985 had probably not divorced the same wife prior to 1980.

Inferences and probabilities, however, are not always enough. The law frequently allows people to be acquitted who were probably guilty; insurance companies deny policies to people who are probably healthy; most people refrain from sky diving although they would probably not be injured thereby. In each case the consequences of a wrong decision are regarded as unacceptable, and the likely benefit from reliance on the probable facts as relatively slight. In the settled judgment of the vast majority of courts that have faced the question, even a slight risk of an incorrect adjudication of bigamy is not justified by whatever benefits may be derived from an accurate diagnosis of that condition. See H. Clark, supra, § 2.7; C. McCormick, supra, § 312 at 654 & n.6; Annot., 14 A.L.R.2d 7, 11-14, and cases cited therein.

Indeed, the decisions give the impression that the courts are more than willing to tolerate a certain amount of bigamy so long as the law can avoid acknowledging and thereby validating it. "This is another instance of the law's treating the de facto assumption of the marital status as paramount to compliance with legal forms." H. Clark, supra, § 2.7 at 69. It is fair to ask whether a less delicate approach --- finding bigamy as a fact whenever the evidence so preponderates, and relying exclusively on the doctrines of equity to mitigate harsh or absurd consequences --- might not be preferable. See Part III, infra. No decision to depart from the great weight of persuasive authority, however, should be made in a case in which the proofs and the equities are as weak as they are here. We find that petitioner did not carry his burden of proving affirmatively and

38

conclusively that respondent had a living and lawful spouse on December 6, 1980.

### III. Equitable Barriers to Relief

If petitioner had proven that his marriage was bigamous from 1980 until 1985, his knowledge of such bigamy from its outset would raise serious questions about his right to an annulment.

Many courts, while holding that a bigamous marriage is "void ab initio" and cannot be ratified by the parties even after the dissolution of the earlier marriage, nevertheless refuse to grant annulment to a party who knowingly contracted such a marriage.

Such relief is sometimes denied on the ground that a party, having contracted a marriage with full knowledge of the facts constituting the impediment, is estopped to deny the validity of the marriage. See In re Marriage of Recknor, 187 Cal. Rptr. 887 (Cal. App. 1982); In re Marriage of Sumners, supra. Cf. Higgins v. Higgins, 588 S.W.2d 454 (Ark. 1979); Gress v. Gress, 209 S.W.2d 1003 (Tex. App. 1948).

In cases where a marriage was bigamous because of the invalidity of a prior divorce, courts have held that a party to the earlier divorce --- or one who married a party to the divorce despite knowledge of its invalidity --- is estopped to deny its validity. Such a person is therefore estopped to assert the bigamy of the later marriage. See, e.g., Sears v. Sears, 293 F.2d 884 (D.C. Cir. 1961); Schotte v. Schotte, 21 Cal. Rptr. 220 (Cal. App. 1962); McIntyre v. McIntyre, 191 S.E. 507 (N.C. 1937); Kazin v. Kazin, 405 A.2d 360 (N.J. 1979).

The Supreme Court of California has specifically applied the estoppel to deny divorce decrees to a California interlocutory judgment, which "at least gives color as a judicial determination of divorce . . . ." Spellens v. Spellens, 317 P.2d 613 (Cal. 1957). Since even a slight presumption in favor of the validity of marriage would lead to us to conclude on the present record that respondent had obtained an interlocutory decree in her uncontested 1979 divorce action prior to December of 1980, this estoppel would defeat the present action even in

39

the absence of more fundamental obstacles. See notes 1-2, supra, and accompanying text.

Most often, however, the denial of an annulment to one who was a knowing participant in bigamy is by reference to "unclean hands" or pari delicto. A court should not "aid a man who founds his cause of action on his own immoral or illegal act." Otte v. Pierce, 194 P.2d 331, 334 (Colo. 1948), quoting Potter v. Swinehart, 184 P.2d 149, 151-52 (Colo. 1947).

> Where the contract or transaction in question is illegal, fraudulent, or immoral, and there is mutual misconduct of the parties with respect thereto, neither law nor equity will aid either to enforce, revoke, or rescind. To such disputes the courts will not listen, and the parties thereto they will leave in the exact position in which they have placed themselves.

Otte, supra, at 334, quoting Baker v. Couch, 221 P. 1089, 1090 (Colo. 1923). See also Higgins v. Higgins, 146 So.2d 122, 123 (Fla. App. 1962) (annulment available "only to an innocent party"); Tyll v. Keller, 120 A. 6, 7 (N.J. 1923) (husband with prior knowledge of wife's bigamy who "afterward tired of his bargain" barred from relief); Hansen v. Fredo, 303 A.2d 333 (N.J. Super. 1973) (In uncontested annulment case "a court of equity, as a court of conscience, should sua sponte raise" unclean hands defense.). Cf. Halker v. Halker, 285 N.W.2d 745 (Wis. 1979); Belcher v. Belcher, 88 N.E.2d 344 (Mass. 1949).

Many cases have refused to apply estoppel and unclean hands to suits for annulment based on bigamy. See, e.g., Simmons v. Simmons, 19 F.2d 690 (D.C. Cir. 1927); Johnson v. Johnson, 16 So.2d 401 (Ala. 1944); Townsend v. Morgan, 63 A.2d 743 (Md. 1949); Kiesenbeck v. Kiesenbeck, 26 P.2d 58 (Or. 1933). The usual justification is that the social interest in condemning bigamy, and in rooting it out where it is found to exist, transcends the personal interests and transgressions of the parties. Society "refuses to countenance the continued perpetration of crime between such parties in violation of law and good morals." Simmons, supra, 19 F.2d at 691.

When a party files a suit for annulment of his marriage, he is deemed as coming into court repenting of his wrongdoing and asking the court to correct his wrongful act as far as possible, in order to prevent any injurious consequences which might be cast thereby in the future upon innocent persons and upon the State.

Townsend, supra, 63 A.2d at 746.

Careful application of equitable doctrines such as estoppel and clean hands, however, may well complement rather than defeat society's interest in opposing and deterring bigamy. If this Court should come across a plaintiff whose suit was apparently motivated by remorse for his offense against society's moral and legal code, equity will not bar relief. See Ramshardt v. Ballardini, 324 A.2d 69 (N.J. Ch. 1974). In general, however, annulments "have in fact become . . . substitutes for divorce." Commissioners' Note to Uniform Marriage and Divorce Act § 208. Leaving aside the occasional blackguard to whom the nullity and consequent easy terminability of bigamous marriages are a positive attraction, the typical plaintiff is someone who has "tired of his bargain." The American Samoa divorce statute requires a five-year waiting period for divorce except where one party is at fault and the other is not. A.S.C.A. 42.0202. A special exception to the principles of equity, whose sole effect would be to allow a certain class of wrongdoers to extricate themselves from unwanted marital bargains far more easily than people who have done nothing wrong, seems an unusually bad way to show disapproval of such wrongdoing.

The straightforward application of equitable principles --- under which (1) innocent persons may treat a bigamous marriage as null, and (2) any innocent person with a cognizable interest may secure a judicial declaration to this effect, but (3) a person who deliberately brought such a marriage into being is effectively denied any rights he would not have if the marriage were valid --- would seem far more effective both as an expression of social disapproval and as a deterrent to future bigamy. "To hold otherwise protects neither the welfare nor morals of society but . . . is a flagrant invitation to others to circumvent the law, cohabit in unlawful state, and when tired

41

of such situation, apply to the courts for a release from the indicia of the marriage status." Spellens, supra, at 618, quoting Harlan v. Harlan, 161 P.2d 490, 494 (Cal. App. 1945.)

Equitable bars to causes of action based on the plaintiff's own wrong, moreover, are not designed only for the litigants. They also protect the courts themselves from the appearance (and sometimes from the substance) of helping to make crime pay. When people have called upon the state to declare them married, have taken oaths proclaiming themselves eligible to be married, have held themselves out as married and derived whatever social advantages are to be gained from the marital status, for the Court to make itself available to declare them unmarried without a showing that this would be convenient to anyone but themselves "would be the juridical equivalent of driving the getaway car." Pritchard, supra, 11 A.S.R.2d at 27.

The marriage now before us, moreover, is clearly not bigamous at present. If it were, there would be some force in the argument that by denying an annulment the Court would be "countenanc[ing] the continued perpetration of crime." Simmons, supra, at 691. Moreover, in a case where the prior marriage had never been dissolved it would be far more likely that an annulment of the later marriage would help to clarify the rights of innocent third parties. In some such cases, and even in some other cases,[4] the equities in favor of granting an

---

[4] For instance, if either the petitioner or the respondent had contracted yet another marriage and children had been born to this marriage, these children would have an interest in having their status clarified. See Townsend, supra, 63 A.2d at 746.

The argument of Townsend and some other cases, that every annulment case involves the status of hypothetical future children, is in our opinion insufficient to meet the arguments in favor of equitable barriers to relief. This argument assumes that because the marriage is "void ab initio" the parties are free to disregard it and to remarry even if an annulment action is barred by estoppel or unclean hands. But this is not true: an estoppel sufficient to bar an annulment should also bar the right to remarry without first obtaining a divorce. "The theory is that the marriage is not made valid by reason of the estoppel but that the estopped person may not take a position that the . . . marriage was invalid." Spellens, supra, 317 P.2d at 618. See also In re Marriage of Sumners, supra; In re Marriage of Recknor, supra.

The idea that people can contract marriages and then simply disregard them if they are "void ab initio" is subject to a variety of practical and theoretical objections. Cf. Perlstein v. Perlstein, 204 A.2d 909, 911 (Conn. 1964):

annulment might be even stronger than the equities against it. In the case before us, however, no such equities appear.

Our conclusion that these equitable principles should apply to actions for annulment, even in cases of alleged bigamy, is bolstered by the Territorial statutes dealing with such actions. In providing that the High Court "may" annul any marriage that was illegally contracted, A.S.C.A. § 42.0203 restates the general rule that annulment is an extraordinary remedy to which equitable principles would ordinarily apply. See generally Pritchard, supra, 11 A.S.R. at 25-27. The rest of the chapter, A.S.C.A. §§ 42.0204-11, is primarily devoted to a series of strict rules against judgment by default, collusive suits, and the granting of judgment in favor of a "guilty" party. Although some of these provisions make more sense in the context of a divorce than of an annulment, the general statutory scheme calls just as clearly for a fault-based analysis in annulment actions as in divorces.[5] This scheme reinforces the general rule that neither law nor equity should "aid a man who founds his cause of action on his own immoral or illegal act." Otte, supra, 194 P.2d at 334.

---

Seldom, if ever, would a party to a bigamous marriage, in the face of the presumption of its validity, feel free to treat the marriage as a nullity without a decree of annulment. Nor do we believe any attorney would advise such a course of conduct.

[5] Each of the seven sections after § 42.0204 either explicitly refers to annulment actions or refers back in some way to § 42.0204, which provides that either husband or wife may petition for "dissolution of a marriage contract on any ground set out in § 42.0202 and 42.0203." A.S.C.A. § 42.0203 deals exclusively with annulment.

Of special importance is § 42.0207, which states that "[c]ondonation may be presumed in all matrimonial actions by the voluntary cohabitation of the parties with the knowledge of the offense charged." (Emphasis supplied.) Although condonation had its origin in the law of divorce, the courts of at least one jurisdiction recognize it as a defense to an action for annulment. See Callaghan v. Leonard, 387 A.2d 390 (N.J. Super. 1978); Hansen v. Fredo, supra. The doctrine of condonation could be meaningfully applied to an annulment action only where, either because of a continuing impediment to the marriage or for some other reason, cohabitation with knowledge would not result in ratification. In cases where ratification is possible, such cohabitation creates a valid marriage; in cases where ratification is not possible, A.S.C.A. § 42.0207 might still raise a bar to judicial relief. Since the effects of such a bar in this case would be identical to the effects of estoppel or unclean hands, however, we need not decide whether condonation would also bar the requested relief.

## IV. The Validity of Formerly Bigamous Marriages

Although petitioner's marriage may well have been "void <u>ab initio</u>," it may or may not be void today. If respondent was already legally married when she purported to marry the petitioner, then their marriage was void and could not be ratified by any amount of cohabitation. When she procured the divorce from Carter in 1985, however, any impediment to her marriage to the petitioner would have been lifted.

In the case of most impediments to a valid marriage --- fraud, duress, "nonage," extreme intoxication, insanity --- voluntary cohabitation after the lifting of the impediment would amount to "ratification." The parties would then be legally married, without the need for a new ceremony. In theoretical terms, the new agreement to marry after the lifting of the impediment "relates back" to the marriage ceremony; or perhaps the ceremony "relates forward" to the time of the new agreement. In the case of bigamy, however, and in the closely related case of a marriage contracted prior to the conclusion of a statutory waiting period after a divorce, courts generally hold that no ratification is possible even after the lifting of the impediment. <u>See</u>, <u>e.g.</u>, <u>Simmons</u>, <u>supra</u>; <u>Johnson</u>, <u>supra</u>; <u>Townsend</u>, <u>supra</u>; <u>Kiesenbeck</u>, <u>supra</u>.

The rule against ratification in such cases is conceptually unnecessary. Although it is frequently justified on the ground that ratification can occur only where a marriage is "voidable" rather than "absolutely void," this argument is circular: the words bring no substantive content to the analysis, but exist primarily as terms by which to classify marriages that can and cannot be ratified. To say that a bigamous marriage cannot be ratified because it is "absolutely void" is to say that it cannot be ratified because it cannot be ratified.

It is sometimes said that a relationship begun while one of the parties is already married is "meretricious" and therefore cannot ripen into a valid marriage; but a relationship to which one party's formal consent was obtained at gunpoint can also be fairly described as meretricious, and yet this can be ratified with no need for a new ceremony. Although the rule against ratification of formerly bigamous marriages is usually stated as

44

though it were a principle of metaphysics, it is almost certainly a rule of policy "influenced by a deeply felt hostility to bigamous or other 'void' marriages." H. Clark, supra, § 3.3 at 130.

As a rule of policy it is probably counter-productive. It often punishes the innocent and rewards the guilty. Even where the rule is derived from statutory designation of certain kinds of marriages as void, "serious harm can result . . . of a sort which the legislators very likely would not have sanctioned had the possibility occurred to them." Commissioners' Note to Uniform Marriage and Divorce Act § 207. And yet "[f]rom a pragmatic viewpoint, judicial invalidation . . . years after [the marriage ceremony] . . . is a less than effective sanction against an institution whose charm lies in its immediate respectability." Spellens, supra, at 619.

Courts in some jurisdictions deal with the problem of formerly bigamous marriages by holding that voluntary cohabitation after the dissolution of the prior marriage gives rise to a valid common-law marriage. See, e.g., Matthews v. Britton, 303 F.2d 408 (D.C. Cir. 1962). At least nine other states have adopted statutes recognizing that cohabitation after the lifting of the impediment, at least in some circumstances, results in a valid ceremonial marriage. See Uniform Marriage and Divorce Act § 207(b) (adopted in Arizona, Colorado, Illinois, Minnesota, Missouri, Montana, and Washington as of February, 1985); Turner v. Turner, 75 N.E. 612 (Mass. 1905); Smith v. Smith, 190 N.W.2d 174 (Wis. 1971).

The Supreme Court of Wisconsin has ruled, relying on its powers as a court of common law rather than on the state statute, that a "void" marriage which both parties knew to be bigamous at its outset becomes "voidable" upon the dissolution of the earlier marriage that constituted the impediment. It may then be ratified and become a valid marriage. Smith v. Smith, 190 N.W.2d 174, supra. See also Halker, supra. This rule is quite similar to that provided by Uniform Marriage and Divorce Act § 207(b).

Of the various rules that have been applied to formerly bigamous marriages, the rule endorsed by the Commissioners of Uniform State Laws and applied by the Wisconsin Supreme Court seems most

consistent with the principles that otherwise apply to the validity of marriages. Since the Wisconsin rule would provide for ratification only of formerly bigamous marriages, never of presently bigamous ones, it is not inconsistent with society's refusal to countenance bigamy or to encourage its continuation. In this case, however, we have no occasion to decide what rule applies in American Samoa.

## V. Conclusion and Order

Petitioner did not prove that respondent had a living and lawful spouse on December 6, 1980. In any case his action for annulment would have been barred by estoppel and unclean hands. We therefore need not decide whether the marriage, if bigamous at its outset, was ratified by the cohabitation of the parties after respondent's divorce from her first husband. The relief requested must be denied and the action dismissed.

It is so ordered.